IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WILLIAM L. ALLEN, et al. | * | |
| | * | |
| v. | * | Civil No. CCB-11-33 |
| | * | |
| BANK OF AMERICA CORP., et al. | * | |
| | * | |

******

MEMORANDUM

Plaintiffs William Allen, Ann Allen, and Denise Angles initiated this action against Defendants Bank of America Corporation ("Bank of America"); BAC Home Loans Servicing, LP ("BAC"); Federal National Mortgage Association ("Fannie Mae"); Western Union Company, doing business as Equity Accelerator and Paymap, and Western Union Financial Services, Inc. (collectively, "the Western Union defendants"[1]); and Edward Cohn ("Cohn"), asserting federal and state statutory and common-law claims. The plaintiffs' claims arose after an automatic mortgage-payment program operated by the Western Union defendants allegedly malfunctioned so that their monthly mortgage payments appeared delinquent. As a result, BAC, the mortgage servicer, which allegedly acted as the "sponsor" of the mortgage-payment program, sought to foreclose on the plaintiffs' home. Now pending before the court are the defendants' motions to dismiss the plaintiffs' amended complaint.[2]

BACKGROUND

---

[1] For purposes of their motion, the Western Union defendants addressed these entities—The Western Union Company, Equity Accelerator, Paymap, and Western Union Financial Services, Inc.—collectively. This court will do the same.

[2] Bank of America, BAC, and Fannie Mae have styled their motion as a motion to dismiss or, in the alternative, for summary judgment. As the plaintiffs have not yet had an opportunity to conduct discovery, this will be construed as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

1

William and Ann Allen, who are married, have resided at 529 Oella Avenue, Ellicott City, Maryland since they purchased the property in 1967. When they obtained the mortgage relevant to the present action, Mr. and Mrs. Allen owned the property as joint tenants with their daughter, Denise Angles, who also resides there. (Am. Compl. ¶¶ 18–21.) In 2002, the plaintiffs sought to refinance their mortgage, and Mr. and Mrs. Allen secured a loan from GreenPoint Mortgage Funding, Inc. ("GreenPoint"). Mr. and Mrs. Allen signed the Note, under which they were required to make monthly mortgage payments of $901.49. (Defs. BAC Home Loans Servicing, LP, Bank of America Corp. and Federal National Mortgage Association's Mot. Dismiss or, in the Alternative, Summ. J. ("BAC Defs.' Mot. Dismiss"), Ex. 1.) All three plaintiffs signed the Deed of Trust. (Am. Compl. ¶ 22; BAC Defs.' Mot. Dismiss, Ex. 3.) Fannie Mae currently holds the Note and is the secured party under the Deed of Trust. (Am. Compl. ¶ 15.)

In January 2006, after making timely mortgage payments for three years, Mr. and Mrs. Allen received a "Special Offer" from GreenPoint entreating them to enroll in an automatic mortgage-payment program called Equity Accelerator ("the Program"). The solicitation stated that GreenPoint would act as the "mortgage servicer 'sponsor'" of the Program, which was being offered "pursuant to an agreement with Paymap, Inc.," the owner of the Equity Accelerator service. The parties to the enrollment agreement would be the sponsor, GreenPoint, and the borrowers, Mr. and Mrs. Allen. According to the letter, the Program would reduce their mortgage debt by automatically debiting their bank account twice per month in an amount exceeding what was necessary to satisfy their monthly mortgage payment; the surplus would be applied towards principal at the time the monthly payment was made. The debited funds first would be held in a Western Union bank account for up to three days. After the Western Union

2

defendants deducted their "program fees," the funds would be transferred to a bank account held by the sponsor. Finally, on the due date, the sponsor would apply the funds towards the plaintiffs' mortgage. Mr. and Mrs. Allen enrolled in the Program. (*Id.* ¶¶ 24–28.)

From April 2006 to November 2007, the Program made timely payments towards the plaintiffs' mortgage. The December 2007 mortgage payment, however, was not transmitted to GreenPoint due to a Program error. The plaintiffs did not receive any notice of a problem, so they believed they were up to date in their mortgage payments in October 2008, when GreenPoint notified them that the servicing of their mortgage was being transferred to Countrywide Home Loans Servicing, LP ("Countrywide"). The transfer was effective November 1, 2008. (*Id.* ¶¶ 28–34 & Ex. 3.) Countrywide subsequently sent the plaintiffs a notice of transfer, assuring them that the Program would continue to pay their mortgage through automatic debits, with Countrywide acting as sponsor. (*Id.* ¶ 36.) The Program did not, however, continue to function as promised. The November 2008 payment was transmitted to GreenPoint rather than Countrywide. (*Id.*, Ex. 3.) Then, in late November 2008, the Program failed to debit the plaintiffs' account despite the presence of adequate funds, so it lacked sufficient funds to make the December payment on the due date. On December 8, 2008, Mr. and Mrs. Allen received from Countrywide a notice of intent to accelerate, demanding payment of three-months rent and late fees to cure the default. The Allens inquired about refinancing their mortgage, but they learned they could not do so because their credit report showed their mortgage in default. (*Id.* ¶¶ 38–40.)

Discovering for the first time that their mortgage payments were not up to date, Mr. Allen made numerous telephone calls to Countrywide, but he was unable to determine how the mortgage was in default despite their enrollment in the Program and the presence of adequate

funds in their bank account. From January to July 2009, the Program had debited the Allens' account and paid their mortgage regularly. Mr. and Mrs. Allen, however, received additional notices of intent to accelerate, and Mr. Allen continued to make telephone calls to Countrywide, which became BAC in April 2009, in an unsuccessful attempt to resolve the situation. Ultimately, in July 2009, BAC refused to accept the Allens' mortgage payment, and, on July 22, 2009, Mr. and Mrs. Allen received a Notice of Intent to Foreclose from Cohn, Goldberg and Deutsche, LLC, Defendant Cohn's law firm. (*Id.* ¶¶ 43–56 & Ex. 2.) Because their July payment had been refused, Mr. and Mrs. Allen began to hold their monthly mortgage payments in a separate savings account, and they represent they are ready and willing to pay this sum to BAC and Fannie Mae.[3] (*Id.* ¶ 77.)

In response to the threat of foreclosure, the plaintiffs enlisted the assistance of Carrie Corcoran, a family friend. (*Id.* ¶ 58.) In a letter to Cohn, dated August 1, 2009, Corcoran reported that, through a conversation with representatives of Paymap and Bank of America, she determined Paymap had erroneously sent the plaintiffs' November 2008 payment to GreenPoint and failed to make payments in December 2007 and December 2008. She requested a stay of all foreclosure proceedings. (*Id.*, Ex. 3.) Through Corcoran's efforts, Mr. Allen secured letters from Western Union stating that the Program failed to disburse the December 2008 payment on time and requesting that no fees be assessed or negative credit notations be made as a result. The letter stated it had been forwarded to BAC. (*Id.* ¶ 61 & Ex. 4.)

---

[3] The defendants argue that the plaintiffs' failure to make mortgage payments since July 2009 constitutes a default, so even if default did not occur when the November and December 2008 payments were not received on time, the plaintiffs cannot now claim that the foreclosure was wrongful. The plaintiffs have alleged, however, that they ceased submitting payments only after BAC wrongfully refused to accept the July 2009 mortgage payment. In light of BAC's refusal and the plaintiffs' representation that they have segregated the funds owed in a separate account, the court will not conclude at this stage in the litigation that the failure to pay since July 2009 resulted in a default permitting BAC to initiate a foreclosure action.

Cohn initiated a foreclosure action in Baltimore County Circuit Court on September 24, 2009. Corcoran continued to press the plaintiffs' case with BAC, so, on October 7, 2009, a Bank of America employee, Zachary Harris, sent an email to Cohn, Goldberg and Deutsche, LLC, requesting that the foreclosure be placed "on hold." (*Id.* ¶¶ 62–65.) Cohn caused the entire filing in the foreclosure action to be posted on the plaintiffs' front door on October 19, 2009. On January 25, 2010, Cohn had the plaintiffs personally served. Although BAC, Fannie Mae, and Cohn agreed to a voluntary dismissal of the foreclosure action on April 12, 2010, BAC has since sent two notices stating Mr. and Mrs. Allen's account is in foreclosure and demanding over twenty-one thousand dollars to bring the account current. (*Id.* ¶¶ 73–79.)

In the instant action, the plaintiffs assert the following counts: (I) injunctive relief; (II) violation of the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law § 14-201 *et seq.*; (III) violation of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-101 *et seq.*; (IV) violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*; (V) breach of contract; (VI) negligence; (VII) violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*; (VIII) disparagement of title; (IX) invasion of privacy—false light; and (X) defamation.

STANDARD OF REVIEW

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the

light most favorable to the plaintiff."[4]  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007) (internal citations and alterations omitted). Thus, a plaintiff is obligated to set forth sufficiently the "grounds of his entitlement to relief," offering "more than labels and conclusions." *Id.* (internal quotation marks and alterations omitted). It is not sufficient that the well-pleaded facts create "the mere possibility of misconduct." *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1950 (2009). Rather, to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

---

[4] A number of documents were attached as exhibits to the complaint and the defendants' motions. It is well established that, in deciding a motion to dismiss, a court may consider any document that is a matter of public record as well as any exhibits attached to the complaint. 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004). When an attached exhibit conflicts with the complaint's bare allegations, the exhibit prevails. *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

Exhibits attached to a defendant's motion to dismiss, in contrast, may be considered without converting the motion to one for summary judgment only if the document "was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (internal quotation marks, alterations, and citations omitted). Of the documents presented by the defendants, only the Note and Deed of Trust fulfill these requirements. (BAC Defs.' Mot. Dismiss, Exs. 1 & 3.) Both are referenced in the complaint, and they are integral, as they provide the basis for the plaintiffs' rights to the property and define the terms of their relationship with the lender, including when default occurs. The court will disregard the defendants' other exhibits. *See Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 996 (4th Cir. 1997).

face," meaning the court could draw "the reasonable inference that the defendant is liable for the conduct alleged." *Id.* at 1949 (internal quotations and citation omitted).

ANALYSIS

I.  ***Bank of America***

The plaintiffs have asserted claims against both Bank of America and BAC, its wholly owned subsidiary. Bank of America seeks dismissal on the grounds that, as a mere shareholder, it cannot be held liable for BAC's conduct.

Under the doctrine of limited liability, a shareholder—including a corporate parent—may not be held liable for the acts of a corporation. *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir. 1987). Only where a parent corporation "dominates [its] subsidiary 'to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation,'" may a court peer behind the corporate veil and vitiate the benefits of limited liability. *Id.* at 981 (quoting *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1106 (5th Cir. 1973)). In the instant action, the plaintiffs have not pled facts showing that Bank of America dominates BAC to such an extent that veil piercing is appropriate. At most, the plaintiffs allege BAC represents itself to customers as "Bank of America." This alone, however, does not show that BAC lacks separate corporate interests and functions solely to achieve Bank of America's purposes. Nor is this assertion supported by the attachments to the complaint, where BAC, in its correspondence, identifies itself as BAC Home Loans Servicing, LP, and Bank of America Home Loans. (*See* Am. Compl., Exs. 7A & 7B.) These names merely reinforce its subsidiary status. Bank of America may not be held liable for its subsidiary's alleged wrongdoing in servicing the plaintiffs' loan. Accordingly, all claims against it will be dismissed.

II.  **BAC & Fannie Mae**[5]

    A. Breach of Contract

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 776 A.2d 645, 651 (2001). BAC contends this count fails because the complaint did not allege a contractual relationship between itself and the plaintiffs; rather, the plaintiffs' agreement was with Paymap. This assertion is not, however, supported by the amended complaint, which states that the parties to the agreement enrolling the plaintiffs in the Program were the borrowers—Mr. and Mrs. Allen—and the servicer-sponsor—GreenPoint. (Am. Compl. ¶ 27.) The plaintiffs further allege Countrywide told them in the notice of transfer of servicing that the Program would continue to debit their account and make their monthly payments (*Id.* ¶ 36), giving rise to the reasonable inference that Countrywide assumed GreenPoint's obligations under this agreement. Accordingly, the plaintiffs have pled sufficient facts to show BAC, as Countrywide is now called, owed them a contractual obligation to make timely deductions and mortgage payments through the Program, and BAC breached this obligation.

    B. RESPA

The plaintiffs maintain BAC has violated RESPA, which regulates, inter alia, the servicing of federally related mortgage loans. *See* 12 U.S.C. § 2605. The plaintiffs allege BAC

---

[5] In general, "a mortgage servicer acts as the agent of the mortgagee to effect collection of payments on the mortgage loan," *R.G. Fin. Corp. v. Vergara-Nuñez*, 446 F.3d 178, 187 (1st Cir. 2006), and BAC and Fannie Mae have treated the plaintiffs' allegation of an agency relationship between them as true for purposes of their motion (Defs.' Bank of America Corp., BAC Home Loans Servicing, L.P., and Federal National Mortgage Ass'n Reply 9 n.4). Thus, because this court finds the plaintiffs have stated claims as to the servicer, BAC, these claims will be permitted to proceed as to Fannie Mae as well.

is liable under this Act for treating as late a payment erroneously transmitted to GreenPoint and for failing to respond adequately when the plaintiffs disputed BAC's assertions that their account was in default.

Among other requirements for the servicing of federally regulated mortgages, RESPA prohibits a servicer, following a transfer of servicing, from imposing a late fee or otherwise treating a loan payment as late "[d]uring the 60-day period beginning on the effective date of transfer of the servicing . . . , if the payment is received by the transferor servicer (rather than the transferee servicer who should properly receive payment) before the due date applicable to such payment." § 2605(d). The amended complaint and its exhibits contain facts showing a violation of this subsection. The plaintiffs allege the Program transmitted their November 2008 mortgage payment to GreenPoint, the transferor servicer, rather than Countrywide, the transferee servicer. Despite RESPA's prohibition on the imposition of late fees for such an error, on December 8, 2008—far fewer than sixty days after the transfer became effective on November 1, 2008—the Allens received from Countrywide a Notice of Intent to Accelerate, demanding payments and late fees for three months, including November 2008. Accordingly, the plaintiffs have stated a claim under RESPA.[6]

### C. Disparagement of Title, False Light & Defamation

The plaintiffs' claims for disparagement of title, false light, and defamation arise from the reporting of their default to credit agencies and the filing of the foreclosure action, specifically the posting of the foreclosure filing on the property. Neither of these events is actionable, however, so the claims must be dismissed.

---

[6] As the plaintiffs adequately allege BAC violated § 2605(d), the court will not at this time determine whether they also state a claim for a violation of § 2605(e), which requires a servicer to undertake certain actions in response to a borrower's "qualified written request" for information or for a correction to their account.

First, to the extent the plaintiffs' common-law claims rest upon reports provided by BAC or Fannie Mae to credit agencies, they are preempted by the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* The FCRA provides in relevant part:

> [N]o consumer may bring any action or proceeding in the nature of defamation [or] invasion of privacy . . . against any . . . person who furnishes information to a consumer reporting agency . . . based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e). Malice may be established by showing the defendant "acted with reckless disregard to the truth or falsity of the reported debt." *Spencer v. Hendersen-Webb, Inc.*, 81 F. Supp. 2d 582, 598 (D. Md. 1999). "Reckless disregard" requires "the defendant either (1) made the statement with a 'high degree of awareness of . . . probable falsity'; or (2) actually entertained serious doubts as to the truth of the statement." *Id.* (quoting *Foretich v. Capital Cities/ABC*, 37 F.3d 1541, 1551 n.8 (4th Cir. 1994)) (omission in original).

The plaintiffs allege they suffered harm because, when they were denied refinancing of their mortgage in December 2008 and when their application for a reverse mortgage was rejected before July 2009, they learned their credit report showed them to be in default. (*See* Am. Compl. ¶¶ 39, 54.) The plaintiffs' allegations do not show, however, that at those times BAC and Fannie Mae acted with reckless disregard in reporting that the plaintiffs were in default. BAC did not receive notice from the Western Union defendants that the default was the result of Program errors until August 2009, and the plaintiffs' allegations regarding their earlier communications with BAC are not sufficiently specific to show that BAC had a "high degree of awareness" of the falsity of the report. The exception to the FCRA's preemption provision therefore does not apply.

10

Second, the filing of the foreclosure action and the posting of the filing at the plaintiffs' property are protected by an absolute privilege applicable to defamatory statements made in connection with a judicial proceeding.[7] In the recent case of *Norman v. Borison*, 418 Md. 630, 17 A.3d 697 (2011), the Maryland Court of Appeals explored the contours of this privilege. The court observed that "witnesses, parties, and judges" enjoy "absolute immunity from civil liability," for statements made in a judicial proceeding, "even if the statement is wholly unrelated to the underlying proceeding." *Id.* at 708. The privilege also extends to statements made in connection with quasi-judicial proceedings, such as administrative proceedings, "if the proceeding satisfies the two part test of *Gersh v. Ambrose*, 291 Md. 188, 434 A.2d 547 (1981)."[8] *Norman*, 17 A.3d at 709. *Gersh* dictates that, in deciding whether a proceeding gives rise to an absolute privilege, a court must consider "'(1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements.'" *Id.* at 710 (quoting *Gersh*, 434 A.2d at 552). Additionally, the privilege applies even "to out-of-court statements, made by witnesses, parties, or judges, when (1) the contemplated or ongoing proceeding fulfills *Gersh*, and (2) the context of the statement demonstrates that it was made during the course of the proceeding." *Id.* at 713 (internal

---

[7] For this reason, Counts VIII and IX will be dismissed as to Defendant Cohn as well. Attorneys enjoy immunity so long as the disputed statement bears "some rational relation to the matter at bar." *Norman*, 17 A.3d at 709; *see also id.* at 714. The foreclosure filing is clearly related to the proceeding, so it is privileged as to Cohn.

[8] Judicial foreclosures are uncommon in Maryland; instead, "most foreclosures are accomplished through the filing of an order to docket, which does not involve any hearings prior to, or meaningful judicial supervision of, the sale." *Wells Fargo Home Mortg., Inc. v. Neal*, 398 Md. 705, 922 A.2d 538, 550 (2007) (citations omitted). "This 'power of sale' foreclosure is 'intended to be a summary, in rem proceeding' which carries out 'the policy of Maryland law to expedite mortgage foreclosures.'" *Id.* (quoting *G.E. Capital Mortg. Servs. v. Levenson*, 338 Md. 227, 657 A.2d 1170, 1178 (1995)). It may be that this type of action would be considered a judicial proceeding for purposes of determining the existence of a privilege, but even if it is considered quasi-judicial, it satisfies the requirements of *Gersh* and gives rise to an absolute litigation privilege.

11

quotation marks omitted). In *Norman*, for example, an attorney's publication of a complaint to the press and on the internet was privileged even though the complaint had not yet been filed. *See id.* at 715–17.

Although the plaintiffs contend the procedural safeguards are insufficient, this court concludes that a foreclosure action satisfies the *Gersh* test. Chapter 14 of the Maryland Rules governs the procedure of the proceeding, which takes place in the Maryland Circuit Court. The borrower or record property owner, moreover, has an opportunity to present defenses—as did the plaintiffs here—and may move to stay or dismiss the action. *See* Md. Rule 14-211. Further, the foreclosure court filings were, by definition, made during the course of the proceeding, so their publication is absolutely privileged. Accordingly, Counts VIII, IX, and X will be dismissed.

Finally, as the plaintiffs have stated claims against BAC at least for breach of contract and a violation of RESPA, the motion to dismiss will be denied without prejudice as to the plaintiffs' claims for injunctive relief, negligence, and violations of the MCDCA, MCPA, and FDCPA.[9] The defendants may renew their arguments regarding these counts by way of a motion for summary judgment at the close of discovery, if warranted.

---

[9] BAC argues the FDCPA claim must be dismissed because servicers are exempt from the requirements imposed by this statute, which addresses "the use of abusive, deceptive, and unfair debt collection practices by . . . debt collectors." 15 U.S.C. § 1692(a). Typically, mortgage servicers are excluded from the statutory definition of debt collectors because at the time they begin servicing, the loans are not in default. *See Perry v. Stewart Title Co.,* 756 F.2d 1197, 1208 (5th Cir. 1985); *Scott v. Wells Fargo Home Mortg., Inc.*, 326 F. Supp. 2d 709, 718 (E.D. Va. 2003). Where a servicer believes a loan to be in default at the time it commences servicing, however, courts have found it is not exempt from the FDCPA's definition of "debt collector." *See, e.g.*, *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536–39 (7th Cir. 2003); *Shugart v. Ocwen Loan Servicing, LLC*, 747 F. Supp. 2d 938, 942–43 (S.D. Ohio 2010) ("[The] exception, which may operate to remove a loan servicer from the definition of a 'debt collector', does not apply if the loan was in default at the time it was acquired by the servicing company, or if the servicing company treated it as such."). Plaintiffs have alleged here that in December 2008, less than two months after the transfer of servicing became effective, Countrywide demanded mortgage payments and late fees for three months, indicating Countrywide treated the plaintiffs'

III.    *Western Union Defendants*

The plaintiffs allege the Western Unions are liable for a violation of the MCPA, breach of contract, and negligence.

A. <u>MCPA</u>

The MCPA proscribes the use of "unfair or deceptive trade practice[s]" in the "sale, lease, rental, loan, or bailment of any consumer goods . . . or consumer services," or the offer thereof; "[t]he extension of consumer credit"; and "[t]he collection of consumer debts." Md. Code Ann., Com. Law § 13-303. The Act further provides a nonexhaustive list of prohibited practices, including the making of false or misleading misrepresentations that have "the capacity, tendency, or effect of deceiving or misleading consumers" and the "[f]ailure to state a material fact if the failure deceives or tends to deceive." Md. Code Ann., Com. Law §§ 13-301(1), (3), (9). The plaintiffs claim the Western Union defendants violated the MCPA by falsely representing that the Program would make timely and accurate payments, thereby reducing the total interest paid on their mortgage; falsely representing that the Program would continue to function properly following the transfer of servicing; and failing to disclose that the Program had malfunctioned.[10] (Am. Compl. ¶ 101.) The plaintiffs have not alleged, however, that the Western Union defendants made *any* representations to them. According to the complaint, all affirmative representations regarding the Program and its functioning during and following the transfer of servicing were made by GreenPoint or Countrywide. In order to state a claim under

---

loan as in default when acquired. The typical exception therefore does not apply, and the plaintiffs' FDCPA claim may proceed.

[10] Significantly, the plaintiffs do not assert that the Western Union defendants violated the MCDCA, as they claim the other defendants did. A violation of the MCDCA constitutes an "[u]nfair or deceptive trade practice[]" under the MCPA. Md. Code Ann., Com. Law § 13-301(14)(iii). Hence, in order to state an MCPA claim against the Western Union defendants, the plaintiffs must identify an actionable misrepresentation or omission of a material fact.

13

the MCPA, the plaintiffs therefore must allege the Western Union defendants failed to state a material fact and the failure deceived or tended to deceive the plaintiffs.

To violate the MCPA, a defendant need not intend to deceive the consumer. *See Golt v. Phillips*, 308 Md. 1, 517 A.2d 328, 332–33 (1986); *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 874 A.2d 919, 970 (2005). Rather, at most, the MCPA requires that the defendant know or have reason to know of a defect that is not disclosed. *Hayes v. Hambruch*, 841 F. Supp. 706, 714 (D. Md. 1994), *aff'd*, 64 F.3d 657 (4th Cir. 1995) (unpublished per curiam opinion) ("[T]his Court concludes that a landlord may not be held liable under the CPA for a failure to state a material fact . . . , unless the landlord knows or has reason to know of the defect."); *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 645 A.2d 1147, 1157–59 (1994), *overruled on other grounds by Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 835 A.2d 616 (2003).[11] The plaintiffs have pled sufficient facts to show that the Western Union defendants had reason to know that the Program malfunctioned. Unlike the landlord-tenant cases cited by the defendants, in which the defect emerged while the property was in the tenant's possession, *see Richwind*, 645 A.2d at 1159; *Scroggins v. Dahne*, 335 Md. 688, 645 A.2d 1160, 1163–64 (1994), in the instant action, the Western Union defendants allegedly had control over the Program and possession of the funds at the time the Program malfunctioned. The fact that the funds remained in their account after the mortgage payment due date provided the defendants with a reason to know of the defect. Accordingly, the allegations support a finding that they failed to state a fact regarding a

---

[11] *Golt* appears to contradict *Hayes*, *Richwind*, and *Scroggins v. Dahne*, 335 Md. 688, 645 A.2d 1160 (1994) by suggesting that not even knowledge of the defect is required under the MCPA. The Court of Special Appeals sought to reconcile this apparent contradiction in the landlord-tenant context in *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md. App. 217, 674 A.2d 106, 136 n.16 (Ct. Spec. App. 1996). This court need not explore this issue because the plaintiff's allegations meet the higher standard for scienter by showing that Western Union had reason to know of the Program's defect.

product defect about which they had reason to know. The Western Union defendants do not contend that the fact the Program malfunctioned was not material. The plaintiffs thus have stated a claim under the MCPA as to these defendants.

      B. <u>Breach of Contract</u>

The plaintiffs further maintain the Western Union defendants are liable for breach of contract. As noted by the Western Union defendants, the plaintiffs do not allege the existence of a contract between Western Union, Paymap, or Equity Accelerator and any plaintiff. This does not, however, defeat the plaintiffs' claim because Maryland law permits certain third-party beneficiaries to a contract to sue for its breach. *See Shillman v. Hobstetter*, 249 Md. 678, 241 A.2d 570, 575 (1968) (acknowledging Maryland's adoption of third-party beneficiary doctrine).

Traditionally, privity of contract between the parties has been a required element for a breach-of-contract claim. *Mackubin v. Curtiss-Wright Corp.*, 190 Md. 52, 57 A.2d 318, 320 (1948). Third-party beneficiary doctrine permits a plaintiff to sue on a contract, despite a lack of privity, where the parties to the contract entered into the agreement with the intent to confer a benefit on the plaintiff. *Flaherty v. Weinberg*, 303 Md. 116, 492 A.2d 618, 622 (1985). In contrast, a third party who merely receives an incidental—as opposed to intended—benefit acquires no right enforceable in contract. *See Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 969 A.2d 284, 295–96 (2009). There are two categories of intended third-party beneficiaries who may sue to enforce a contract: (1) a donee beneficiary, where the purpose of the contract is to confer a gift upon the beneficiary, and (2) a creditor beneficiary, where the purpose of the contract is to satisfy a duty of the promisee to the beneficiary. *Id.* at 295 (quoting *Mackubin*, 57 A.2d at 321).

The plaintiffs' pleadings support the inference that they were the creditor beneficiaries of a contract between GreenPoint (and, later, Countrywide/BAC) and the Western Union defendants. The offer letter sent by GreenPoint soliciting the Allens' participation in the Program states that the service was offered pursuant to an "agreement" with the Western Union defendants, indicating the existence of a contract. (Am. Compl. ¶¶ 24–26; Ex. 1.) Upon the Allens' enrollment, GreenPoint owed them a duty to deduct certain amounts from their bank account and apply these funds towards their mortgage on specified dates. GreenPoint's contract with the Western Union defendants enabled it to fulfill this duty. Moreover, the Western Union defendants deducted fees from the funds taken from the plaintiffs' account, supporting a finding that they intended to provide a service to the plaintiffs. (*Id.*) As intended third-party beneficiaries, the plaintiffs may sue to recover for the breach of contract that allegedly occurred when the Western Union defendants failed to make deductions and mortgage payments pursuant to the Program's terms.

The plaintiffs have, at minimum, alleged sufficient facts to state plausible claims for relief against the Western Union defendants under the MCPA and for breach of contract. As with BAC and Fannie Mae, the Western Union defendants' motion to dismiss will be denied without prejudice.

IV. *Cohn*

Finally, Cohn, the substitute trustee in the foreclosure action, seeks dismissal of the claims against him on the grounds that the plaintiffs' allegations fail to support these claims and the FDCPA claim is untimely. As noted above, Cohn enjoys immunity for the alleged malicious and defamatory statements made in the filing of the foreclosure action and the posting of the filing, so Counts VIII and IX will be dismissed.

A. MCDCA & MCPA

The MCDCA provides in relevant part that a debt collector may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." Md. Code Ann., Com. Law § 14-202(8). For purposes of this statute, "knowledge" has been construed to include "actual knowledge or reckless disregard as to the falsity" of the existence of the right. *Spencer*, 81 F. Supp. 2d at 595. As noted previously, to establish "reckless disregard," a plaintiff must show "the defendant either (1) made the statement with a 'high degree of awareness of . . . probable falsity'; or (2) actually entertained serious doubts as to the truth of the statement." *Id*. at 598 (quoting *Foretich*, 37 F.3d at 1551 n.8) (omission in original).

The plaintiffs here have failed to allege facts sufficient for the court to infer that Cohn attempted to collect a debt with a high degree of awareness of its probable nonexistence or that he actually doubted its existence. At the time Cohn instituted foreclosure proceedings, BAC had considered the plaintiffs to be in default for over six months. Even though Ms. Corcoran wrote him to explain the default as a series of mistakes on the part of the Western Union defendants, the letter itself confirmed that the servicer never received at least three monthly payments. (Am. Compl., Ex. 3.) Although a BAC representative subsequently confirmed the debt was disputed, the plaintiffs acknowledge that "[i]n response to these instructions, Defendant Cohn halted the foreclosure action." (*See* Pls.' Opp'n to Def. Cohn's Mot. Dismiss 8.) Thus, the plaintiffs have not alleged that, when filing and pursuing the foreclosure, Cohn had access to any information other than the servicer's allegation of default and the plaintiffs' protestations to the contrary. Cohn's reliance on the servicer's accounting over the plaintiffs' contentions does not rise to the level of "reckless disregard." Therefore, the plaintiffs have failed to properly state a claim that

17

Cohn violated the MCDCA. The plaintiff's MCPA claim with respect to Cohn is premised on his alleged MCDCA violation. Accordingly, both claims will be dismissed.

### B. FDCPA

To be timely, a private action under the FDCPA must be brought within one year of the date of the violation. *Kouabo v. Chevy Chase Bank, F.S.B.*, 336 F. Supp. 2d 471, 475 (D. Md. 2004) (citing 15 U.S.C. § 1692k(d)). Where the alleged FDCPA violation involves the filing of a collection action, the statute of limitations ordinarily begins to run at the time of service. *See Johnson v. Riddle*, 305 F.3d 1107, 1113 (10th Cir. 2002) ("We hold that, where the plaintiff's FDCPA claim arises from the instigation of a debt collection suit, the plaintiff does not have a 'complete and present cause of action,' . . . until the plaintiff has been served." (citation omitted)). Here, service was effectuated and the plaintiffs learned of the action, at the latest, through the posting of the foreclosure filing on the property on October 19, 2009.[12] *See* Md. Rule 14-209(b) (permitting, under certain circumstances, service by mailing and posting). The plaintiffs did not initiate this suit, however, until October 26, 2010. Accordingly, the FDCPA claims are untimely as to Cohn.[13]

### C. Negligence

Cohn asserts he is not liable for negligence because he owed no duty to the plaintiffs. The plaintiffs argue that Cohn may be held liable in tort because a statutory violation may be

---

[12] The plaintiffs contend this form of service was improper, and they were not personally served until January 2010. It is undisputed, however, that plaintiffs were aware of the posting in October 2009. Indeed, several of their state law claims rest upon this occurrence. Thus, the court finds they learned of all facts necessary to reveal the cause of action at that time, and this posting is sufficient to constitute an "attempt to collect" on the debt. Thus, the statute of limitations began to run on October 17, 2009.

[13] This analysis does not apply to BAC and Fannie Mae because the plaintiffs allege they have continued to demand payments and late fees to which they are not entitled and have sent further notices threatening foreclosure despite the dismissal of the prior foreclosure action. (Am. Compl. ¶¶ 79, 108–09.)

18

prima facie evidence of negligence, and Cohn allegedly violated the FDCPA, MCDCA, and MCPA. This argument fails, first, because this court has concluded that the claims under these statutes must be dismissed. In addition, it is well established "that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Sugarloaf Citizens Ass'n, Inc. v. Gudis*, 78 Md. App. 550, 554 A.2d 434, 438 (Ct. Spec. App. 1989); *see also Walton v. Mariner Health of Md., Inc.*, 391 Md. 643, 894 A.2d 584, 599 (2006). Each of the statutes cited by the plaintiffs provide express remedies. Accordingly, the negligence claim against Cohn will be dismissed.

In sum, Cohn's motion to dismiss will be granted, and the Western Union defendants' motion will be denied. Bank of America, BAC, and Fannie Mae's collective motion will be granted in part and denied in part as follows: the motion will be granted on all counts as to Bank of America; with respect to BAC, only Counts VIII, IX, and X will be dismissed; and the plaintiffs may proceed on all claims against Fannie Mae. A separate Order follows.


August 18, 2011 /s/
Date Catherine C. Blake
United States District Judge