## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | : | |
| WILLIAM L. ALLEN, *et al.* | : | |
| | : | |
| v. | : | Civil No. CCB-11-33 |
| | : | |
| BANK OF AMERICA, N.A., *et al.* | : | |
| | : | |
| | : | |

### MEMORANDUM

Plaintiffs William and Ann Allen and Denise Angles ("the Allens") brought this action alleging that defendants Western Union (and related entities) ("Western Union"), Fannie Mae, and Bank of America, N.A. (and related entities) ("BANA"), violated provisions of state and federal law in providing mortgage servicing and mortgage payment services to the Allens. Western Union and BANA have each filed motions for summary judgment and motions to exclude the testimony of the Allens' damages expert, and the Allens have cross-moved for summary judgment and to exclude the defendants' respective damages experts.

### BACKGROUND[1]

The Allens obtained a mortgage loan secured by their home in Baltimore County, which they have lived in since 1967, originated by nonparty GreenPoint and acquired by Fannie Mae in 2002. (BANA Mot. Summ. J., Ex. 1 ("Angles Dep."), ECF No. 80-2, at 20-22; Ex. 3

---

[1] BANA has taken umbrage with the Allens' submissions because they have not included a citation to the record for each factual assertion they make. BANA has not demonstrated that any of the assertions are actually unsupportable, however, the bank merely charges that missing citations alone are grounds for a procedural default under Rule 56. Rule 56(e)(2) actually states that, among other options, the court may consider factual assertions that are not properly supported as "undisputed for the purposes of the motion." Furthermore, every fact relied on by the Allens is supported by admissible evidence, *see Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671-72 (D. Md. 1999), even if the Allens were less than rigorous in citing to the record.

("McDonald Dep."), ECF No. 80-4, at 23-25). GreenPoint continued to service the mortgage

when Fannie Mae acquired it. (McDonald Dep., ECF No. 80-4, at 23-25). The mortgage note

required the Allens to pay slightly more than $900 a month, due on the first of the month, and it

provided a 15-day grace period in which the Allens could pay before the payment was

considered late. (Pls.' Opp. to BANA Summ. J., Ex. 5 at 392-93 ("Mortgage Note"), ECF No.

97-6, at 393; Ex. 4 ("Samara Dep."), ECF No. 97-5, at 173).

    In 2006, the Allens enrolled in the "Equity Accelerator Program" sponsored by

GreenPoint and administered by a Western Union subsidiary. (BANA Mot. Summ J., Ex. 4

("Allen Dep."), ECF No. 80-5, at 26; Ex. 5, ("Bunge Dep."), ECF No. 80-6, at 13-14). The

program was designed to speed up payment of the Allens' mortgage by withdrawing half a

mortgage payment twice a month, plus a small additional amount, into the sponsor's

(GreenPoint's) custodial account and then transmitting a full payment from that account to the

Allen's mortgage servicer whenever enough money for a full payment was in the account.

(Bunge Dep., ECF No. 80-6, at 165-66). GreenPoint received a monthly commission for this

service. (*Id.* at 167-68). The terms and conditions of the program, which the Allens received

when they enrolled, expressly stated in all-caps that the Allens were "solely responsible for

complying with the terms of all loan and other agreements . . . [and] solely responsible for any

payments due and any interest, late fees[,] or other charges that may be assessed." (Western

Union Mot. Summ. J., Ex. C ("Program Terms"), ECF No. 83-4, ¶ 28). The terms also limited

any liability that might be incurred to direct damages of no more than $500, and they expressly

disclaimed any liability for consequential, indirect, or other damages. (*Id.*).

    Scheduling related to the timing of the Allens' retirement income and withdrawals under

the program caused a number of payment errors, culminating in a missed payment in October

2007. (Bunge Dep., ECF No. 80-6, at 154-59). GreenPoint reported the Allens' mortgage one-month delinquent to credit agencies nine non-consecutive times, beginning in November 2007, because of the single missed payment under the program. (BANA Mot. Summ. J., Ex. 7 ("Smith Dep."), ECF No. 80-8, at 105-06). In March 2008, the Allens were denied refinancing by Beneficial Finance because their credit scores had fallen. (Allen Dep., ECF No. 80-5, at 100).

In October 2008, servicing of the Allens' mortgage was transferred from GreenPoint to BANA.[2] (BANA Mot. Summ. J., Ex. 9 ("Samara Dep."), ECF No. 80-10, at 39). In the notice sent to the Allens by BANA advising them of the assignment of their mortgage and transfer of servicing rights, BANA stated: "If your previous servicer was automatically drafting/deducting your monthly payment from your bank account, please disregard the coupon attached below because [BANA] will continue this service without interruption." (Pls.' Opp. to BANA Summ. J., Ex. 5 at 412 ("Welcome Notice"), ECF No. 97-6, at 412). Western Union's records indicate that the program did, without the Allens' prompting, transmit funds to BANA the month after the servicing was transferred. (Pls.' Opp. to BANA Summ. J., Ex. 3 ("Electronic Payment Record"), ECF No. 97-4; Ex. 2 ("Bunge Dep."), ECF No. 97-3, at 121-22).

What happened to the Allens' mortgage after the servicing transfer to BANA is in dispute. BANA's records do not reflect that a November 2008 payment was made, (BANA Mot. Summ. J., Ex. 11 ("Loan History"), ECF No. 80-12), but Western Union's records reflect that a payment was transmitted to BANA's custodial account on November 6, 2008. (Electronic Payment Record, ECF No. 97-4; Bunge Dep., ECF No. 97-3, at 121-22). Western Union's electronic payment record also reflects that regular payments were made to GreenPoint through

---

[2] Servicing was actually transferred to Countrywide Home Loans, which subsequently changed its name to BAC Home Loans Servicing and eventually merged with BANA. BANA is thus Countrywide's successor-in-interest, so the Allens' servicer since October 2008 will be treated as one continuous entity, BANA, for the purposes of resolving this motion.

October 2008, except for the October 2007 missed payment. (*Id.*). Apparently, the Allens' loan was not "boarded" in BANA's systems until November 11, 2008, (Samara Dep., ECF No. 97-5, at 50), and this could account for any initial discrepancies in BANA's accounting of the Allens' payments. But, the irregularities in BANA's processing of the Allens' payments continued. First, when BANA boarded the loan, there appears to have been a partial payment held in suspense of $601.64 in the account when it was transferred. (Loan History, ECF No. 80-12). This amount was apparently a holdover from the October 2007 missing full payment. Rather than continuing to hold the amount in suspense or apply it as a payment, BANA appears to have zeroed out that amount by applying it as "late charges." (*Id.*). BANA suggests that this was an accounting practice permitted by the mortgage note. (BANA Summ. J. Reply, ECF No. 103, at 26) ("[T]he partial payment held in suspense was not applied to past-due late charges . . . it was applied to late charges as they came due in future months, as allowed by the Note."). Both parties agree that the Equity Accelerator Program then malfunctioned again, as it did in October 2007, and the December 2008 payment was not sent to BANA. In January, however, one and a half payments were sent to BANA. (Loan History, ECF No. 80-12). The January half payment, combined with the initial partial-payment in suspense that was zeroed out, would have covered the missing December payment, as permitted by the deed. (*See* BANA Mot. Summ. J., Ex. 2 ("Deed"), ECF No. 80-3, at ¶ 2). But, BANA appears to have simply accepted the half-payment without taking any other action or crediting the Allens for it. BANA also disputes Western Union's records showing that the Allens transmitted, to BANA's custodial account (as indicated by the account number on their electronic payment record), all payements due through June 2009. (Electronic Payment Record, ECF No. 97-4; Bunge Dep., ECF No. 97-3, at 121-22). BANA alleges that the Allens missed their November 2008 and April and June 2009 payments, and that they stopped

making payments altogether after May 2009, but the Allens allege that BANA began *refusing*

payments at some point during that summer. (*See* BANA's Mot. Summ J., Mem., ECF No. 80-1,

at 8; Pls.' Opp. to BANA Summ. J., Mem., ECF No. 97-1, at 5-6). To summarize: the parties

only agree that the Allens missed the October 2007 and December 2008 payments, and, even

then, the Allens contend that BANA's mishandling of funds it received from GreenPoint and the

Equity Accelerator Program were sufficient to have covered the December 2008 missing

payment as permitted by the deed, albeit one month late.

On December 8, 2008, BANA first sent the Allens a Notice of Intent to Accelerate

demanding payments for October, November, and December 2008. (Samara Dep., ECF No. 97-

5, at 44). BANA only made one negative report to a credit reporting agency in February 2009,

stating that the account was 90 days past due. (BANA Mot. Summ. J., Ex. 10 ("Ans. to Pls.'

Interrog."), ECF No. 80-11, at 12). It then reported in March 2009 that the account was current.

(*Id.*). As stated above, at the behest of either BANA or the Allens, no payments were made on

the account as of July 2009, and BANA instituted a foreclosure action on September 24, 2009.

(*See* BANA Mot. Summ. J., Ex. 12 ("Foreclosure Docket"), ECF No. 80-13). The foreclosure

action was voluntarily dismissed on April 19, 2010. (*Id.*).

The Allens subsequently filed suit against the defendants and the suit was removed to this

court in January 2011. In August 2011, the court granted in part and denied in part the

defendants' motions to dismiss. *Allen v. Bank of America Corp.*, 2011 WL 3654451 (D. Md. Aug

18, 2011). Now at issue are the Allens' surviving claims. Against BANA (and Fannie Mae), the

Allens have brought claims under the Maryland Consumer Debt Collection Act ("MCDCA"), the

Maryland Consumer Protection Act ("MCPA"), the Fair Debt Collection Practices Act

("FDCPA"), the Real Estate Settlement Procedures Act ("RESPA"), and common-law breach of

contract and negligence claims. Against Western Union (and its affiliates), the Allens allege

common-law negligence and breach of contract and violations of the MCPA.

## ANALYSIS

### I.      Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified

that this does not mean that any factual dispute will defeat the motion. "By its very terms, this

standard provides that the mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive

law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court must "view the facts and draw reasonable inferences 'in the light most favorable to the

party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)

(alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the

court also must abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774,

778-79 (4th Cir. 1993) (internal quotation marks omitted).

"When both parties file motions for summary judgment, the court applies the same standards of review." *Loginter S.A. Y Parque Indus. Agua Profunda S.A. Ute v. M/V NOBILITY*, 177 F. Supp. 2d 411, 414 (D. Md. 2001) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). "The role of the court is to 'rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Id.* (quoting *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985)).

**II.     Motions for Summary Judgment as to defendants Western Union and affiliates**

Western Union and the Allens have cross-moved for summary judgment on the Allens' contract, negligence, and MCPA claims against Western Union. For the reasons stated below, Western Union's motion will be granted.

**A.  Common Law Contract and Negligence Claims**

In their motion for summary judgment, Western Union first argues that the Allens expressly waived the common-law damages they are seeking through the Equity Accelerator Program terms and conditions to which they consented when they signed up for the program. Paragraph 28 of the terms and conditions, which the Allens do not dispute they received when they enrolled, state in all-caps:

> Customer is solely responsible for complying with the terms of all loan and other agreements you have with [GreenPoint] or any lender or mortgagee. You are solely responsible for any payments due and any interest, late fees[,] or other charges that may be assessed. Notwithstanding anything to the contrary, the cumulative aggregate liability of sponsor, **its third party vendors and service providers** . . . based upon any legal theory or claim, including for any claims or liabilities which may arise out of this agreement, your loan, mortgage, or otherwise shall be limited to your direct, actual damages . . .

(Program Terms, ECF No. 83-4, at ¶ 28) (emphasis added). This provision also limits any direct damages to no more than $500. (*Id.*). Based on this term, the court agrees that the Western Union

7

defendants, as third party service providers under the agreement, are entitled to summary judgment.

The Allens argue that this provision is unenforceable for two reasons. First, they assert that the terms and conditions' waiver of consequential damages is invalid under Maryland law. "Waiver is the intentional relinquishment of a known right, . . . and may result from an express agreement or be inferred from circumstances." *Hovnanian Land Inv. Group, LLC v. Annapolis Towne Centre at Parole, LLC*, 25 A.3d 967, 983 (Md. 2011) (quoting *Food Fair Stores, Inc. v. Blumberg*, 200 A.2d 166, 172 (Md. 1964)). The Allens argue that in order for the express waiver clause in the agreement to have been enforceable, they must have been informed that the program might fail, and payments might be missed, prior to their acceptance of the program terms. In other words, they suggest that their purported acceptance of Paragraph 28 was not "knowing" and therefore not a valid waiver of their right to seek consequential damages for the missed payments. The program terms do not disavow *any* liability, however, but rather limit liability to direct damages of no more than $500. Paragraph 28 states in clear terms that the Allens remained responsible for monitoring their mortgage payments and that the program service providers were not assuming full responsibility for ensuring payments were posted. Thus, this provision is a valid and enforceable waiver of the type of claims the Allens now bring. The waiver provision operates to ensure that some recourse was available for program errors, but it also prevents customers from shifting entirely their duties under their mortgage contract onto the program sponsor (or, as the Allens attempt here, the sponsor's third-party service providers). *See Lavine v. Am. Airlines, Inc.*, --- A.3d ----, 2011 WL 6003609, at *5 n.10 (Md. App. 2011) (quoting *Winterstein v. Wilcom*, 293 A.2d 821, 824 (Md. App. 1972) ("In the absence of legislation to the contrary, the law, by the great weight of authority, is that there is ordinarily no

public policy which prevents the parties from contracting as they see fit, as to whether the plaintiff will undertake the responsibility of looking out for himself.").[3]

Second, the Allens also argue that the provision is an unenforceable liquidated damages term. In the sense that the term limits any direct damages recovery to a fixed amount of no more than $500, under a strained reading, this could be construed as a liquidated damages term. Even so, the case law the Allens cite striking liquidated damages terms are all concerned with whether the damages constitute an unconscionable "penalty" because they are too *high*. *See, e.g.*, *Willard Packaging Co., Inc. v. Javier*, 899 A.2d 940, 948-99 (Md. App. 2006) ("Under the penalty doctrine, a liquidated damages provision fixing an unreasonably large liquidated damages amount is void as a penalty."). Taken together with the validity of contractual clauses *limiting* liability, even if the $500 term were somehow a "liquidated damages" provision, the term is not an unenforceable penalty under Maryland law.

To the extent that the Allens are seeking direct damages (up to the $500 limit), their common law claims also fail because they cannot be characterized as "third-party beneficiaries" of the Equity Accelerator program contract between GreenPoint (the sponsor) and Western Union. In their memoranda, the Allens confuse the two agreements at issue here. The primary agreement is the one that the Allens entered into with GreenPoint (as sponsor of the program). That agreement sets out the scope of the relationship between the Allens and GreenPoint and states that they are the only two parties to that agreement. (Program Terms, ECF No. 83-4, at

---

[3] *Winterstein* does caution that clauses limiting liability may be void where "one party is at such an obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence." As noted above, however, the terms and conditions do not waive all of the Allens' rights: rather, they limit the types and amount of damages they can recover and ensure that customers are still responsible for monitoring their own payments and mortgage account. Furthermore, the Allens were under no compulsion to agree to participate in the Equity Accelerator program.

¶ 1). Thus, the Allens have no claim under that agreement against Western Union and its affiliates as third-party service providers, and that agreement creates no duties owed to the Allens by Western Union. The Allens attempt to conflate that agreement with the contract that Western Union entered into with GreenPoint to provide payment services for the program. (Pls.' Opp. to Western Union Summ. J., Ex. 3 at 147 ("Sponsor Agreement"), ECF No. 99-4). Under Maryland law, the "crucial fact" for determining whether a party can enforce a contract as a third-party beneficiary is "whether the pertinent provisions in the contract were 'inserted . . . to benefit' the third party." *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.2d 170, 212 (Md. 2012) (citation omitted) (alterations in original). The Allens point to no provision of the contract between GreenPoint and Western Union that was included for the benefit of customers like the Allens. The mere fact that a company contracted with another to provide a service to its customers does not automatically create contractual duties between the contractor and the customers. To the extent that Western Union's processing mistakes were somehow a breach of the contract between Western Union and GreenPoint, even if they harmed the Allens, the Allens do not have standing to enforce that contract.

The Allens also cannot demonstrate the "intimate nexus" required to create a tort duty for purely economic losses where no contract governs the alleged claim. *See Blondell v. Littlepage*, 991 A.2d 80, 96 n.8 (Md. 2010) ("[T]he finding of any duty is circumscribed by the relationship of the parties."); *Chicago Title Ins. Co. v. Allfirst Bank*, 905 A.2d 366, 378-81 (Md. 2006). Here, the express terms of the Equity Accelerator Program, and all the program materials, established by contract the extent of the legal relationship between GreenPoint and the Allens. Imposing a duty on Western Union as a third-party service provider of GreenPoint under the program would improperly expand the scope of this contractual relationship. In short, the Allens are barred from

seeking even $500 in direct damages from Western Union under any common law theory.

## B.  MCPA

Finally, the Allens' MCPA claim against Western Union fails because the Allens have

not adduced any evidence of an "unfair or deceptive trade practice" by Western Union, as

defined by § 13-301 of the MCPA. The Allens allege that Western Union misrepresented or

omitted material facts about defects of the Equity Accelerator Program. However, the  two

malfunctions the Allens experienced in October 2007 and November 2008 were apparently the

only glitches of this type in the program's history, (Western Union Mot. Summ. J., Ex. E

("Bunge Dep."), ECF No. 85-1,  at 200), and the Allens themselves have submitted a substantial

amount of documentary evidence showing that when Western Union was alerted to the errors,

their representatives took the problems seriously and worked diligently to rectify them. (*See, e.g.*,

Pls.' Opp. to Western Union Summ. J., Ex. 3 at 125 ("Paymap Logs"), ECF No. 99-4, at 125-

131). While a defendant who knows or has a reason to know of a defect may be liable under the

MCPA for failing to disclose the defect,  *see Hayes v. Hambruch*, 841 F. Supp. 706, 714 (D. Md.

1994), *aff'd*, 64 F.3d 657 (4th Cir. 1995) (unpublished per curiam opinion), there is no evidence

in the record that Western Union knew or had reason to know of the glitch that caused the missed

payments until after both had occurred, at which point it continued to work with the Allens and

their servicers to resolve the issue. The Allens also suggest that they were misled by Western

Union because they did not know they were supposed to monitor their account or mortgage

payments after they enrolled, but the program terms and conditions, as described above, stated

they were responsible for monitoring their mortgage. A "frequently asked questions" document

provided by Western Union explained how they could monitor program payments through their

mortgage statements and bank statements; it also provided a customer service number to resolve

any issues with the program. (Pls.' Opp. to Western Union Summ. J., Ex. 2 at 12 ("Equity

Accelerator FAQ"), ECF No. 99-3).  While the program malfunctions may have caused

frustrating problems for the Allens, they do not constitute, nor are they evidence of, false or

deceptive trade practices by Western Union within the scope of the MCPA. Accordingly,

Western Union's motion for summary judgment will be granted and the Allens' cross-motion for

summary judgment will be denied.[4]

### III.     Motions for Summary Judgment as to defendants BANA and Fannie Mae

The Allens and BANA have cross-moved for summary judgment on the Allens' FDCPA,

MCDCA, MCPA, RESPA, contract, and negligence claims, as well as their claim for injunctive

relief. Because genuine issues of material fact exist on some of the Allens' claims, BANA's

motion will be granted in part and denied in part, and the Allens' motion will be denied.

### A.  Fannie Mae

BANA first argues that all of the Allens claims against Fannie Mae fail because Fannie

Mae did not participate in any of the allegedly unlawful activity giving rise to their lawsuit. The

Allens reply that Fannie Mae can be held liable under Maryland law for the actions of BANA, its

mortgage servicer, under a principal-agent theory. "Agency is the fiduciary relation which results

from the manifestation of consent by one person [the principal] to another [the agent] that the

other shall act on his behalf and subject to his control and consent by the other so to act." *Ins.*

*Co. of N. Am. v. Miller*, 765 A.2d 587, 593 (Md. 2001) (quoting *Green*, 735 A.2d at 1047).

"Although such a relationship is not necessarily contractual in nature, it is always consensual, . . .

---

[4] The Allens'  motion for leave to file a second amended complaint also will be granted, over
Western Union's opposition. The proposed second amended complaint does not make any
substantive changes to the Allens' claims, however, and Western Union's motion for summary
judgment applies equally to it. The Allens' and Western Union's cross-motions in limine to
exclude each other's experts will be denied as moot.

and its creation is to be determined by the relations of the parties as they exist under their agreements . . . The ultimate question is of intent." *Id.* (internal citations omitted). Fannie Mae's servicing guide, which the Allens admit controls the relationship between Fannie Mae and its servicers, including BANA, and which the Allens have attached in part to their memoranda, expressly states that "[s]ervicers service Fannie Mae loans as independent contractors and not as agents, assignees, or representatives of Fannie Mae; thus most of the policies and standards described in this Guide are intended to set forth broad parameters under which servicers should exercise their sound professional judgment . . ." Fannie Mae Single Family Servicing Guide, Part I, Chapter 2, Section 202, Servicer's Basic Duties and Responsibilities (12/08/08). Thus, the intent of the agreement between Fannie Mae and BANA is unambiguous: BANA is *not* an agent of Fannie Mae and Fannie Mae is entitled to summary judgment on all of the Allens' claims because it was not in any way directly involved with the wrongdoing alleged in this matter.

   **B. FDCPA**

   Under the FDCPA, 15 U.S.C. § 1692k(d), "a private action must be brought within one year from the date on which the violation occurred." *Kouabo v. Chevy Chase Bank, F.S.B.*, 336 F. Supp. 2d 471, 475 (D. Md. 2004). The Allens do not dispute BANA's contention that the statute of limitations had run because they filed their complaint in state court on October 26, 2010, more than one year after BANA's foreclosure filing in September 2009. Instead, the Allens argue that BANA waived the statute of limitations under *Peterson v. Air Line Pilots Assoc., Int'l.*, 759 F.2d 1161, 1164-65 (4th Cir. 1985) ("It is well settled that the defense of limitations is waived unless asserted promptly by way of answer or motion."). This is a close question because BANA waited nearly two years since the commencement of the lawsuit to raise the defense and it had ample opportunity to do so when it filed a thorough motion to dismiss and

13

when the Allens amended their complaint. *See id.* ("Although waiver is not automatic, requiring a showing of prejudice or unfair surprise, . . . we are persuaded by considerations of fairness, entirely separate from the extensive investment of time and energy expended on discovery before the action was dismissed on limitations grounds."); *Bland v. Fairfax County, VA*, 799 F. Supp. 2d 609, 613 (E.D. Va. 2011). It took eighty docket entries for BANA to raise this issue, and it could have prejudiced the Allens, who have conducted extensive discovery, to now be barred from bringing this claim, which they filed only a month later than when BANA alleges the limitations period had run. *Cf. Kouabo*, 336 F. Supp. 2d at 475 (finding defendant entitled to summary judgment on FDCPA claim because plaintiff had filed suit *three years* after last alleged violation). Nevertheless, because, as explained below, BANA is entitled to summary judgment on the Allens' FDCPA claim and the Allens have filed a motion to amend their complaint, which would permit BANA to file an amended answer, the court will not decide whether BANA waived the statute of limitations.

Notwithstanding the FDCPA's limitations provision, BANA is correct that it is not a covered entity under the statute. Ordinarily, mortgage servicers are not "debt collectors" under the Act because they are not persons who "attempt to collect debts 'owed or due or asserted to be owed or due *another.*'" *Padgett v. OneWest Bank, FSB*, 2010 WL 1539839, at *14-15 (N.D. W. Va. April 19, 2010) (quoting 15 U.S.C. § 1692(a)(6)) (emphasis in original).[5] Some courts have recognized that a mortgage servicer may be a "debt collector" under the act where they acquired a mortgage in default "solely for the purpose of facilitating collection of such debt . . . ." 15 U.S.C. § 1692a(4); *see Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 538-539 (7th Cir. 2003). However, this court agrees with the *Padgett* court's analysis of a similar claim that

---

[5] Unpublished cases are cited for the soundness of their reasoning, not for any precedential value.

BANA is more properly characterized as a "creditor" under the Act because it "stepped into the shoes" of GreenPoint when it began servicing the Allens' mortgage; it did not acquire the mortgage primarily to collect any amount that may have been in default. *See Padgett*, 2011 WL 1539839 at *15 (quotation omitted). Accordingly, BANA is entitled to summary judgment on the Allens' FDCPA claim.

### C. MCDCA

Under the MCDCA, however, neither party is entitled to summary judgment. The MCDCA prohibits collectors from "claim[ing], attempt[ing], or threaten[ing] to enforce a right with knowledge that the right does not exist." Md. Code Ann., Comm. Law, § 14-202(8). "This has been held to mean that a party may not attempt to enforce a right with actual knowledge or with reckless disregard as to the falsity of the existence of the right." *Kouabo*, 336 F. Supp. 2d at 475 (citing *Spencer v. Hendersen-Webb Inc.*, 81 F. Supp. 2d 582, 594-95 (D. Md. 1999)). BANA insists it is entitled to summary judgment because it is undisputed the Allens missed their October 2007 payment, so their mortgage was in default when BANA obtained it. BANA asserts that this gave it an absolute "right" to conduct all of the collection actions the Allens contest, including serving the Allens with the Notice of Intent to Accelerate in December 2008 (demanding payment for three months when the evidence suggests the Allens were, at that point, actually only behind by one or two payments), reporting their loan 90-days past due in February 2009 when evidence suggests it was only 30 days past due, and ultimately filing a foreclosure action the following September claiming the Allens were more than a single payment behind. But, BANA points to no legal authority suggesting that the MCDCA's definition of a "right" is so narrow. The Allens have submitted convincing evidence that they transmitted payments, through Western Union, to BANA's custodial account for which BANA did not credit their

mortgage account. (Electronic Payment Record, ECF No. 97-4; Bunge Dep., ECF No. 97-3, at

121-22). If so, BANA may have wrongfully attempted to enforce the right to collect those

payments.

So, whether BANA violated the MCDCA turns on two genuine issues of material fact:

(1) whether the Allens did not, in fact, owe the disputed payments (which would mean BANA

wrongly attempted to enforce a right) and, relatedly, (2) whether BANA knew or recklessly

disregarded the truth that it did not have the right to demand those payments. BANA's own

records, which do not reflect these payments, (*see* Loan History, ECF No. 80-12), suggest it did

not have actual knowledge it did not have a right to collect them. However, no evidence in the

record conclusively demonstrates that BANA did not act with "reckless disregard" for the true

status of the Allens' mortgage account. Alternatively, if BANA did receive the payments, even if

it did not apply them to the Allens' mortgage, the fact that the funds were in BANA's custodial

account could indicate it had "constructive knowledge" it had no right to demand the payments.

*See Kouabo*, 336 F. Supp. 2d at 475. These are questions for the jury. Accordingly, neither

BANA nor the Allens are entitled to summary judgment on the Allens' MCDCA claim.

### D.  MCPA

Likewise, neither party is entitled to summary judgment on the Allens' MCPA claim.

First, a violation of the MCDCA is a per se violation of the MCPA. Md. Code Ann., Comm.

Law, § 13-301(14)(iii). Second, the MCPA prohibits any "[f]alse . . . or misleading oral or

written statement . . . or other representation of any kind which has the capacity, tendency, or

effect of deceiving or misleading consumers." § 13-301(1). To violate the MCPA, a defendant

need not intend to deceive the consumer. *See Consumer Prot. Div. v. Morgan*, 874 A.2d 919, 970

(Md. 2005); *Golt v. Phillips*, 517 A.2d 328, 332-33 (Md. 1986). "[W]hether a statement is

'misleading' is judged from the point of view of a reasonable, but unsophisticated consumer."

*Sager v. Housing Comm'n of Anne Arundel County*, 855 F. Supp. 2d 524, 558 (D. Md. 2012)

(citing *Luskin's Inc. v. Cons. Protection Div.*, 726 A.2d 702, 712 (Md. 1999)). In order to

recover damages for the injury or loss sustained, "[c]onsumers must prove that they relied on the

misrepresentation in question." *Bank of America, N.A. v. Jill P. Mitchell Living Trust*, 822 F.

Supp. 2d 505, 532 (D. Md. 2011) (citing *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 235 (Md.

2000)).

Most of BANA's alleged violations of the MCPA are premised on the failures of the

Equity Accelerator Program, and the Allens have not adduced any evidence that BANA was in

any way involved with that program. When the Allens' mortgage was transferred, BANA stated

in its welcoming documents:  "If your previous servicer was automatically drafting/deducting

your monthly payment from your bank account, please disregard the coupon attached below

because [BANA] will continue this service without interruption." (Welcome Notice, ECF No.

97-6, at 412). The Allens argue that this was a misrepresentation because the electronic transfers

scheduled through GreenPoint and the Equity Accelerator Program did not "continue . . . without

interruption." BANA contends that this cannot serve as a basis for the Allens' MCPA claim

because (1) it did not apply to the Allens' automatic payments, (2) it was not false or misleading,

and (3) the Allens did not rely on it. BANA's arguments are unavailing.

First, BANA argues that the statement did not apply to the Allens' payments because the

Equity Accelerator Program—not the Allens' "previous servicer"—was automatically

withdrawing payments from their account. While technically this may be true, BANA also has

emphasized throughout its pleadings that GreenPoint, the Allens' "previous servicer," was

always the "sponsor" of the Equity Accelerator Program, and, as explained above, GreenPoint

entered into the program agreement with the Allens, not Western Union or any other entity.
Thus, a jury could find that, from the perspective of a reasonable, unsophisticated consumer, the
statement could have been misleading because GreenPoint, their "previous servicer," would
seem to have been "automatically drafting/deducting" the Allens' payments from their bank
account. And, since the automatic payments deducted from the Allens bank account may not
have been properly applied to their account by BANA, a jury could further conclude that
BANA's statement that the Allens' automatic payments would continue "without interruption"
was false or misleading. Importantly, the fact that BANA may not have known that the Allens
were enrolled in the Equity Accelerator Program is immaterial because, as noted above, BANA
need not have intended to deceive the Allens to be liable under the MCPA for a misleading
representation.

A jury also could find that the Allens relied on BANA's statement by trusting that the
Equity Accelerator transfers would continue with their new servicer and opting not to take
measures to ensure that transfers continued. Had BANA not told the Allens that their electronic
transfers would continue "without interruption," the Allens may have contacted the program
customer service number or BANA's representatives to inquire about the continuation of the
program, or they may have more closely monitored their new account to ensure that the
automatic payments did continue. This may have led to a discovery of the payments that appear
to have been sent but not received by BANA, preventing many of the damages the Allens now
claim. Therefore, there are genuine issues of material fact on the Allens' MCPA claim and
neither party is entitled to summary judgment.

### E.  Contract

Furthermore, while BANA is correct that there is no evidence it was an assignee of the

Equity Accelerator program agreement between the Allens and GreenPoint, and BANA could not have breached that agreement, there is still a genuine issue of material fact as to whether BANA breached its obligations directly under the Allens' mortgage deed and note as servicer. The Allens contend that BANA breached its contractual duties by failing to properly apply payments it received and demanding payments it was not owed. BANA argues, unconvincingly, that because *its own records* indicate that the contested payments were never applied to the Allens' mortgage account, (*see* Loan History, ECF No. 80-12), they were not received by BANA at all. But, BANA's records are directly contradicted by the Allens' and Western Union's electronic transfer records, (Electronic Payment Record, ECF No. 97-4; Bunge Dep., ECF No. 97-3, at 121-22), showing those payments were transmitted to BANA's custodial account. Thus, BANA's records reflecting the missing payments demonstrate, at most, that there is a genuine factual dispute—one that cannot be resolved on summary judgment—as to whether BANA breached its servicing duties under the Allens' mortgage note by failing to properly apply payments it received from the Allens and demanding the allegedly missed payments without cause. Accordingly, neither BANA nor the Allens are entitled to summary judgment on the Allens' breach of contract claim.

### F.  Negligence

BANA is entitled to summary judgment on the Allens' negligence claim because the Allens have not demonstrated that BANA owed them a duty of care in tort. "It is well established that 'the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and creditor and is not fiduciary in nature.'" *Kuechler v. Peoples Bank*, 602 F. Supp. 2d 625, 633 (D. Md. 2009) (quoting *Yousef v. Trustbank Savs.*, F.S.B., 568 A.2d 1134, 1138 (Md App. 1990)). "Courts have been exceedingly reluctant to find special

circumstances sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship or to impose any duties on the bank not found in the loan agreement." *Id.* (quoting *Parker v. Columbia Bank*, 604 A.2d 521, 532 (Md. App. 1992)). While an "intimate nexus" between the parties may create a tort duty, *see Jacques v. First National Bank of Md.*, 515 A.2d 756, 759-60 (Md. 1986), the Allens have not demonstrated that the special circumstances exist to create a tort duty under their ordinary mortgage agreement with BANA. Accordingly, the court will grant summary judgment in favor of BANA on the Allens' tort claim.

### G. RESPA

Finally, BANA is not entitled to summary judgment on the Allens' claim under RESPA, 12 U.S.C. § 2601 *et seq.*. The Allens argue that BANA violated the Act in two ways. First, they allege that BANA's sending of a Notice of Intent to Accelerate on December 8, 2008, violated a RESPA provision concerning payments that are made to a transferor service during the first 60 days after a servicing transfer. Second, they allege that BANA failed to respond to a "Qualified Written Request" ("QWR") as required by the Act. BANA has demonstrated it is entitled to summary judgment under the first theory, but not the second.

First, the Allens claim that BANA violated 12 U.S.C. § 2605(d), which states:

> During the 60-day period beginning on the effective date of transfer of the servicing of any federally related mortgage loan, a late fee may not be imposed on the borrower with respect to any payment on such loan and no such payment may be treated as late for any other purposes, **if the payment is received by the transferor servicer** (rather than the transferee servicer who should properly receive payment) before the due date applicable to such payment. (emphasis added).

The Allens contend that BANA's Notice of Intent to Accelerate dated December 8, 2008, violated this provision because it "treated as late" the Allens' November payment, which

Western Union's records show was transmitted to BANA on time, during the 60-day period

beginning November 1, 2008, the effective date of transfer of the Allens' mortgage from

GreenPoint to BANA. However, it is undisputed that neither the November payment, nor any

other payment after November 1, was sent to GreenPoint (the parties dispute whether it was sent

to BANA). Thus, the November 2008 payment was not "received by the transferor servicer

[GreenPoint]," and, even if BANA wrongly considered any payment during that period missing

or late, § 2605(d) was not violated by its plain language.

However, 12 U.S.C. § 2605(e)(1)(A) states:

> If any servicer of a federally related mortgage loan receives a qualified written
> request from the borrower (or an agent of the borrower) for information relating
> to the servicing of such loan, the servicer shall provide a written response
> acknowledging receipt of the correspondence within 20 days (excluding legal
> public holidays, Saturdays, and Sundays) unless the action requested is taken
> within such period.

§ 2605(e)(2) further requires, at the very least, that prior to responding to a borrower's

QWR  the servicer "shall . . . after conducting an investigation, provide the borrower with

a written explanation or clarification that includes . . . to the extent applicable, a

statement of the reasons for which the servicer believes the account of the borrower is

correct as determined by the servicer."

The Allens assert that a letter sent from a friend on their behalf to Edward S.

Cohn, BANA's outside counsel, constituted a QWR. (*See* Pls.' Opp. to BANA Summ. J.,

Ex. 11 ("Corcoran Letter"), ECF No. 97-12). BANA argues that this was not a QWR

because it was not sent to the servicer directly. But, § 2605(e)(1) is triggered if the

servicer "receives" the request, regardless of whether it was first directed to the servicer.

BANA does not contend it did not receive the letter. In fact, BANA alternatively argues it

properly responded to the letter. BANA offers *Gorham-DiMaggio v. Countrywide Home*

*Loans, Inc.* for the proposition that a letter sent to a servicer's outside counsel cannot be a QWR, but, in that case, the alleged QWR was a terse e-mail, sent without "crucial" details (or even the borrower's last name), and the court did *not* suggest that a QWR must be sent directly to a servicer, only that it must be *received* by the servicer. 592 F. Supp. 2d 283, 292-93 (N.D.N.Y. 2008) ("[T]he lack of receipt alone has been found fatal in establishing failure to respond to a qualified written request."). Thus, BANA did have an obligation under RESPA to respond to the Allens' letter because it received the letter and the letter contained all the necessary details.

BANA also asserts that it did appropriately respond to the QWR by providing the Allens with an account history. BANA has not, however, demonstrated that it conducted an investigation or provided a sufficient statement detailing why it believed the account was correct, as required by the Act. The Allens' QWR thoroughly explained their concerns regarding the receipt of their payments and the status of their account, and BANA has not adduced evidence that it responded directly to those concerns. BANA has also provided no evidence documenting any attempts it made to investigate the discrepancies between the Allens' and Western Union's electronic transfer records or their accounting of the Allens' payments before BANA went ahead and instituted a foreclosure action, less than 60 days after the Allens sent their QWR to BANA's lawyer. The discovery conducted in this lawsuit has exposed possible errors that likely could have been discovered by an appropriate investigation of the Allens' account. This would seem to be precisely the type of situation RESPA was enacted to remedy. *See Rawlings v. Dovenmuehle Mortg., Inc.*, 64 F. Supp. 2d 1156, 1161-63 (M.D. Ala. 1999). Accordingly, whether BANA did appropriately respond to the QWR is a genuine issue for the jury, and

neither BANA nor the Allens are entitled to summary judgment on the Allens' RESPA claim.[6]

### IV.     BANA's Motion to Exclude the Allens' Damages Expert

Because some of the Allens' claims against BANA will proceed to trial, the court will also address the parties' cross-motions to exclude damages experts. BANA has moved to exclude all of the testimony of the Allens' designated damages expert, Stan V. Smith, asserting that he is unqualified to offer his proposed expert opinions and that the opinions themselves are irrelevant and unreliable. The Allens seek to offer his testimony on two types of damages they allegedly suffered because of BANA's actions: loss of credit expectancy and "hedonic damages" (also known as "loss of enjoyment of life"). The Allens, in turn, have moved to exclude the expert BANA seeks to offer to rebut Smith's testimony. For the reasons set forth below, Smith's testimony on "hedonic damages" will be excluded (as will any testimony by BANA's expert rebutting as much), but the parties' motions will otherwise be denied without prejudice as the relevance and reliability of their expert opinions on the Allens' credit expectancy is an issue for trial.

BANA's argument seeking to exclude Smith's testimony on "hedonic damages" largely focuses on Smith's qualifications and the reliability of his opinions on this issue. Setting aside the question of Smith's credentials and methods, which raise significant doubts about his proposed expert opinions, the court finds that any testimony on so-called "loss of enjoyment of life" or "hedonic damages" would not "help the trier of fact to understand the evidence or determine a fact in issue" as required by Fed. R. Evid. 702(a). *See, e.g.*, *Mercado v. Ahmed*, 974

---

[6] Because the Allens will proceed to trial on their MCDCA, MCPA, RESPA, and breach of contract claims, neither party is entitled to summary judgment on the Allens' claim for injunctive relief at this time.

F.2d 863, 870-71 (7th Cir. 1992). While the Allens are correct that they may seek "noneconomic damages" for emotional injuries they suffered because of BANA's actions, *see, e.g.*, *Hoffman v. Stamper*, 867 A.2d 276, 295-98 (Md. 2005) ("physical" manifestations of mental anguish in fraud cases include "depression, inability to work or perform routine household chores, loss of appetite, insomnia, nightmares . . ."); *Rawlings*, 64 F. Supp. 2d at 1165 (the term "actual damages" includes damages for mental anguish); Md. Code Ann., Comm. Law, § 14-203 (damages under the MCDCA include "damages for emotional distress or mental anguish suffered with or without accompanying physical injury"), a jury is perfectly capable of determining such damages without any expert testimony. *See Hunt v. Mercy Medical Center*, 710 A.2d 362, 374-75 (Md. App. 1998). The court is  not convinced that an expert whose opinion is based almost entirely on asking laypersons how a particular event has affected their enjoyment of life would provide any assistance to the jury in making that determination for themselves. Accordingly, BANA's motion to exclude testimony on this topic will be granted.

Otherwise, the factual questions related to how particular events affected the Allens' credit expectancy are relevant and technical, and the court will reserve ruling on the parties' proposed expert testimony on those issues until trial.

## CONCLUSION

For the above stated reasons: (1) BANA's motion for summary judgment will be granted in part and denied in part, (2) BANA's motion to exclude will be granted in part and denied without prejudice in part, (3) Western Union's motion for summary judgment will be granted; (4) Western Union's motion in limine will be denied as moot; (5) the Allens' cross-motions for summary judgment will be denied; and (5) the Allens' cross-motions in limine, as to Western Union's expert, will be denied as moot and, as to BANA's expert, will be granted in part and

denied without prejudice in part. The Allens' motions for leave to file a second amended

complaint and to seal also will be granted.[7]

        A separate Order follows.


           3/19/13                                                       /s/

Date                                                          Catherine C. Blake
                                                         United States District Judge

---

[7] The parties' motions for summary judgment have been assessed in light of the Allens' second amended complaint. *See* n.4 *supra*.